**ESTATE OF Alexander C. CALLAS, etc., et al., Plaintiffs-Appellees,**

**v.**

**UNITED STATES of America and United States Army Corps of Engineers, Defendants-Appellants.**

No. 81–2578.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1982.

Decided June 11, 1982.

Rehearing Denied Nov. 12, 1982.

---

Callas, instituted this damage action against the United States and the United States Army Corps of Engineers (the "government") seeking recovery for the drowning deaths of her husband and son at Lock and Dam No. 8 on the Mississippi River. Jurisdiction is based on the Suits in Admiralty Act, 46 U.S.C. §§ 741–752 (1976). Following a bench trial on the issue of liability, the district court found all parties negligent and apportioned the fault among them. We affirm the finding of government liability but vacate and remand for reconsideration the district court's apportionment of fault.

Robert B. Breisblatt, Asst. U. S. Atty., Dan K. Webb, U. S. Atty., William R. Coulson, Asst. U. S. Atty., Chief Crim. Receiving & Appellate Div., Chicago, Ill., Frederick H. Branding, Asst. U. S. Atty., Chief Civil Div., for defendants-appellants.

Ronald S. Fishman, Fishman & Fishman, Chicago, Ill., for plaintiffs-appellees.

Before CUDAHY, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and POSNER, Circuit Judge.

CUDAHY, Circuit Judge.

Judith Callas, administratrix of the estates of Alexander C. Callas and Gregory

## I.

On the morning of June 28, 1978, the sixteen foot fishing boat carrying Alexander C. Callas and his nineteen-year old son, Gregory, capsized in front of roller gate no. 1 of Lock and Dam No. 8 on the Mississippi River. Both of the Callases drowned. To understand the legal and factual issues presented by this tragedy, it is first necessary to describe in some detail the structure of the dam and the water conditions around it.

Lock and Dam No. 8 is located on the Mississippi River at Genoa, Wisconsin, and is operated by the defendant, the U. S. Army Corps of Engineers. As illustrated in Figure 1,[1] the lock portion of the structure consists of a main lock chamber and an (inoperable) auxiliary lock adjacent to the east bank of the river in the State of Wisconsin. The main lock and the auxiliary lock are separated by the intermediate wall, or "I-wall." To the west of the river wall is

---

**1.** Figure 1 is based on Government Exhibit 3–C, which is a Corps of Engineers news release, dated August 13, 1968. The diagram of the lock and dam contained in that release is a rough sketch of the structure of Lock and Dam No. 8. We have deleted from the diagram certain irrelevant matter, and have inserted references to the location of the auxiliary lock, I-wall, river wall, warning sign and roller gate no. 1.

the dam portion of the structure. The movable gate section extends westward from the river wall 897 feet across the main channel of the river. This section is composed of five steel roller gates, each 80 feet in length, and ten steel tainter gates, each 35 feet in length. The accident involved in the instant case occurred on the downstream, or south, side of roller gate no. 1, which is the gate closest to the river wall.

The water conditions on the downstream side of the gates are perilous. Rapidly moving water discharged from the dam passes underneath the roller gates, where it strikes the slower river current. The discharged water then collides with baffle blocks located on the floor of the river approximately 60 feet downstream from the gates. These baffle blocks are designed to slow the flow of the water, but their effect is to cause the water to rise to the surface and to create great turbulence in the area in front of the gates. The surfacing water actually raises the water level several inches above the water level immediately in front of the gates, thus causing

(FIGURE 1)

the surface current to flow back toward the dam.[2] In addition to this strong backcurrent, the surfacing water curls back toward the roller gates in a circular movement, sweeping around the south side of the auxiliary lock, past the river wall and into the roller gates. The testimony at trial placed the start of the backcurrent at between 30 and 50 feet downstream from the dam. To the south of the backcurrent, the river flows downstream with such strength and velocity that it is difficult if not impossible to keep a small boat on a course heading upstream toward the roller gates. On the day of the Callas' accident, the water 125 feet below the roller gates was choppy, swirling and turbulent, and this disturbance could be seen at a distance of 300 feet from the dam. Although the turbulence was visible to any boater in the area, the backcurrent was not noticeable and would have been seen only by those boaters looking for it.

Pursuant to discretionary authority vested in him by statute,[3] the Secretary of the Army has promulgated regulations designed to minimize the dangers of boating in the areas around the Mississippi River dams. The regulation applicable to Lock and Dam No. 8 provides:

(s) *Restricted areas at locks and dams.* All waters immediately above and below each dam, as posted by the respective District Engineers, are hereby designated as restricted areas. No vessel or other floating craft shall enter any such restricted area at any time. The limits of the restricted area at each dam will be determined by the responsible District Engineer and marked by signs and/or flashing red lights installed in conspicuous and appropriate places.

33 C.F.R. § 207.300(s) (1981). Since 1968, the area 100 feet downstream from the movable gate section of Lock and Dam No. 8 has been declared a restricted area, which boats are forbidden to enter. The area between 100 feet and 300 feet below the dam, including the auxiliary lock, has been designated as a caution area, which boats are permitted to enter. *See* Figure 1.[4]

The quoted regulation in addition requires that the limits of the restricted areas be marked by "signs and/or flashing red lights installed in conspicuous and appropriate places." In the case of Lock and Dam No. 8, the responsible District Engineer has chosen to employ both signs and lights.[5] Flashing red lights, indicating the boundaries of the restricted area, have been placed on the I-wall at a point 100 feet downstream from the dam. Amber flashing lights, marking the limits of the caution area, have been located 300 feet downstream. *See* Figure 1. Both sets of lights were functioning on the day of the Callas' accident. Warning signs have also been used at Lock and Dam No. 8. From 1968 until the spring of 1978, three large signs were in place along the dam. Each sign

**2.** This phenomenon of water flowing upstream toward a dam has been described in other cases as a "whirlpool action," *Cali v. U.S.*, Civ. No. 5–75–739 (E.D.Cal.1979), or as a "hydraulic jump," *Gemp v. U.S.*, No. C–1–79–592 (S.D. Ohio 1981).

**3.** 33 U.S.C. § 1 (1976) provides in part: "It shall be the duty of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property...." Violations of such regulations are punishable as misdemeanors.

**4.** Prior to 1968, the restricted area extended to 300 feet below the dam and included the auxiliary lock. In 1968, however, at the request of the State of Iowa and other interested parties, the restricted area was reduced to its present 100 feet, thus opening up the auxiliary lock to recreational boating and fishing.

**5.** The Corps of Engineers has supplemented the warning signs and flashing lights with literature and news releases distributed to the public. These publications describe the dangers to boaters posed by the dam and explain the meaning of the flashing red and amber lights. The district court found that in only one of these publications introduced at trial was the danger of the backcurrent mentioned, but this news release states only that "the turbulence in these areas can capsize or draw under a small boat." Gov't Ex. 3–B. Thus, none of this literature specifically warns the public about the backcurrent in front of the roller gates.

read, "Restricted—Keep Away 100 Feet." In March, 1978, however, the signs were removed for repainting and the dam was left entirely without warning signs until June 27, 1978, the day before the Callas' accident. On that afternoon, one of the repainted signs was attached to the south end of the river wall, adjacent to roller gate no. 1. The sign read, "Danger—Keep Away 00 Feet." It should have read "100 feet," but the overlay for the digit "1" had not yet arrived. This single warning sign, absent the digit which indicated the limits of the restricted area, was in place on the morning of June 28, 1978, and would have been visible to the Callases.

Despite these efforts to warn the public of the dangers, boaters regularly transgress the limits of the restricted area. There was testimony at trial that fishermen attempt to get as close to the gates as possible, and that Corps employees at least once a week were forced to shout at boaters to keep them away from the danger area. The Coast Guard is charged with enforcing the navigation regulations but it rarely patrols the area. This situation has resulted in proposals, considered by the Corps, to return the restricted area to 300 feet or to erect a physical barrier to prevent boats from entering the restricted area. Although the safety problems have existed at the dam for some years, the Callases were the first persons to lose their lives in a boating accident in front of the roller gates at Lock and Dam No. 8.[6]

At approximately 10:30 A.M. on June 28, 1978, Alexander Callas and his son, Gregory, rented a sixteen foot boat from an establishment located a few miles from the dam. Attaching their own 9.5 hp engine to the boat, they launched the boat at a landing site on the river downstream from the dam. The purpose of their trip, as it had been on the previous day, was to fish, and they presumably headed north toward the dam and the prime fishing areas. Sometime around 11:30 A.M., not long after the Callases must have arrived at the vicinity of the dam, Corps employees sitting in the stationhouse on the east side of the river heard cries for help. The equipment manager, Paul O. Benson, responded to the call. Jumping onto a nearby bicycle, he rode out to the river wall, which was about a three minute trip. He donned a life jacket and climbed down to the river surface. Immediately in front of roller gate no. 1, Benson observed an overturned boat and debris floating around it—a cooler, a gas tank and flotation cushions. As he watched, a body surfaced momentarily, but just as he tossed a life ring at it, the body again submerged. Benson called for a lifeboat and then went to close the roller gates. The bodies of Alexander and Gregory Callas were subsequently recovered from the river. There were no eyewitnesses to the accident.

The district court found that the Callases were probably fishing in the auxiliary lock with their engine turned off and with no anchor securing the boat. The court concluded that, caught in the circular eddy current carrying the boat toward roller gate no. 1, the Callases were unable to start their engine before the force of the backcurrent swept their boat into the moving roller gate, causing the boat to capsize. The government contends that these findings amount to pure speculation because there were no eyewitnesses to the accident. We are unable to conclude, however, that the findings are clearly erroneous. Alexander Callas on his most recent fishing trip, in May of 1978, had fished in the auxiliary lock, so it was reasonable to conclude that he did the same on the day of the accident. In addition, given the strong downstream current below 100 feet from the dam, a boat could enter the area facing roller gate

6. Although no deaths have resulted, there have been other boating accidents near the roller gates. On June 3, 1978, for example, several weeks before the Callas' accident, a boat drifting freely in the auxiliary lock was carried by the circular motion of the backcurrent toward roller gate no. 1. By the time the engine could be started, the boat had drifted in front of roller gate no. 1 and one man had fallen overboard. The engine did eventually start, the man was retrieved, and the boat returned to the relative safety of the auxiliary lock. No injuries were reported.

no. 1 only by traveling laterally, or westward, from the mouth of the auxiliary lock. Finally, the scenario of a small boat trapped in the eddy current and unable to escape because of engine failure is reasonable since it replicates precisely what happened in a similar, though less tragic, boating accident three weeks before the Callases drowned. *See* note 6 *supra.*

The district court also found that despite their completion of courses in boating safety, the Callases did not carry with them the proper type of life preservers (they had only flotation cushions), or government publications describing the rules and regulations in force at Lock and Dam No. 8. The Callases were also found to have disregarded the warning sign and lights and to have been inattentive in the handling of the boat. These findings of negligence on the part of the Callases are not contested.

 The plaintiffs' complaint charged the government with negligence in the operation and maintenance of Lock and Dam No. 8. Counts I and II alleged jurisdiction based on the "admiralty or maritime character of the claim," and Counts III and IV alleged jurisdiction under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680 (1976): On the government's motion the FTCA counts were dismissed prior to trial.[7] The district court ordered separate trials on the questions of liability and damages and, after a bench trial on liability, the court entered judgment finding all parties negligent. The court apportioned liability among the parties, concluding that the government was 25% at fault in causing the

death of Alexander Callas and 75% at fault in causing the death of Gregory Callas. The government brings this interlocutory appeal challenging its liability. 28 U.S.C. § 1292(a)(3) (1976).

## II.

The district court found that the government's operation and maintenance of Lock and Dam No. 8 had been negligent in several respects. First, the government should not have allowed boats to enter the auxiliary lock. Second, the government should have required local businesses renting boats to distribute literature explaining the dangers associated with the dam. Finally, the district court stated, the government should either have physically blocked off the area of the backcurrent by buoys or booms or have provided more explicit directions and warnings to boaters concerning the danger of the backcurrent. On appeal, the government argues that its conduct in these matters is immune from liability under the discretionary function exception,[8] which has been judicially implied in the Suits in Admiralty Act. *Bearce v. U. S.,* 614 F.2d 556 (7th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980). Consequently, we must decide whether the government's actions, upon which liability was predicated, involve discretionary functions. If they do, the government may not be held liable for damages in the instant case even if it abused its discretion.

 The discretionary function exception precludes government liability for "policy

7. The instant case arises under the Suits in Admiralty Act (SIAA), 46 U.S.C. §§ 741–752 (1976), which encompasses all maritime torts alleged against the United States. *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 176 & n.14, 96 S.Ct. 1319, 1326 & n.14, 47 L.Ed.2d 653 (1976); *Bearce v. U. S.,* 614 F.2d 556, 558 (7th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980). Claims for which a remedy is available under the SIAA are not cognizable under the FTCA. 28 U.S.C. § 2680(d) (1976). The district court thus acted correctly when it dismissed the FTCA counts of the complaint. In its final decision, however, the district court asserted, inconsistently with its earlier dismissal of the

FTCA counts, that the instant case was based on the FTCA and not on the SIAA. This was error, but harmless error, because the district court properly applied admiralty law, including principles of comparative negligence.

8. The discretionary function exception immunizes the government from liability under the Federal Tort Claims Act for "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (1976).

judgments concerning the public interest." *Bearce,* 614 F.2d at 561. This court recently observed that the applicability of the exception ultimately rests upon the characterization of the challenged behavior as involving either "policy," on the one hand, or "operations," on the other hand, elaborating on a distinction between planning and operational decisions first suggested by the Supreme Court in *Dalehite v. U. S.,* 346 U.S. 15, 35–42, 73 S.Ct. 956, 967–971, 97 L.Ed. 1427 (1953). *Emch v. U. S.,* 630 F.2d 523, 527 (7th Cir. 1980), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981). Although many courts have accepted this distinction as the appropriate benchmark, *see, e.g., Lindgren v. U. S.,* 665 F.2d 978 (9th Cir. 1982); *Reminga v. U. S.,* 631 F.2d 449 (6th Cir. 1980); *Sami v. U. S.,* 617 F.2d 755 (D.C.Cir.1979), it provides at best only a guideline. *Canadian Transport Co. v. U. S.,* 663 F.2d 1081, 1087 (D.C.Cir.1980). Thus, as the fruits of several decades of attempts by the courts to devise a workable definition of discretionary functions, judicial formulae are legion. Nonetheless, there is some consensus that the exception applies to governmental decisions that involve the formulation of policy, *Downs v. U. S.,* 522 F.2d 990, 996 (6th Cir. 1975), that call for a weighing of competing interests, *Canadian Transport,* 663 F.2d at 1087, that require an assessment of the practicability or feasibility (including the consideration of budgetary constraints) of a proposed course of action, *Griffin v. U. S.,* 500 F.2d 1059, 1064 (3d Cir. 1974), or that entail an evaluation of how the public interest will best be served, *Gercey v. U. S.,* 540 F.2d 536, 538 (1st Cir. 1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977).

However the test is formulated, it bears repeating that the purpose of the discretionary function exception is to prevent the courts from intruding, through the vehicle of tort suits, upon the decisionmaking authority of the other branches of government. The exception is intended to "protect the Government from liability that would seriously handicap efficient government operations." *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963). As Judge Becker noted in his widely cited opinion in *Blessing v. U. S.,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978), the courts have no legitimate role in deciding questions that involve "not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." Recognizing, however, that this court should not act as "a self-constituted guardian of the Treasury [and] import immunity back into a statute designed to limit it," *Indian Towing Co. v. U. S.,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955), we believe that these principles require analysis of the bases of liability found by the district court to determine whether any substantial liability was assigned with respect to government actions essentially discretionary in character.

We note first that the government's decision in 1968 to reduce the restricted area in front of the dam from 300 feet to 100 feet and to open up the auxiliary lock to recreational boating probably constituted the exercise of a discretionary function for which the government is immune from liability. That decision, presumably one of basic policy, was made in response to public demands that this area—a productive fishing ground—be available for public use and enjoyment. Balanced against this interest was, of course, the heightened risk of boating accidents. The government having thus decided that public use of these waters will better serve the public interest, we presumably may not, given the discretionary function exception, disturb that policy decision by imposing liability.

It may also have exceeded the authority of the district court to premise liability on the failure of the government to require every boat rental establishment in the area to distribute literature warning boaters of the perils of Lock and Dam No. 8. Imposing liability for this omission is equivalent to a judicial command that the government establish a more comprehensive safety program than it has thus far chosen to adopt. The district court's contemplated regulation would also require the creation of potentially costly administrative machinery for the

supervision and enforcement of the distribution requirement. The district court's ruling resembles in this respect a claim rejected by the court in *Gercey v. U. S.*, 540 F.2d 536 (1st Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). In that case, the plaintiff asserted government liability based upon the Coast Guard's failure to take more positive steps to rid the seas of unsafe passenger service boats than the announced policy of simply revoking the licenses of such boats. The First Circuit held that liability would not attach to the mere failure to adopt a comprehensive program for protecting the public from decertified vessels. Similarly, in the instant case, the government's failure to promulgate a regulation requiring private businesses to disseminate safety literature presumably implicates a discretionary function for which the government may not be held liable. In any event, given the widespread circulation that government publications have already received, even without a distribution requirement,[9] we would find it difficult to conclude that the government's conduct in this regard amounted to negligence.

■ Finally, the district court found that the government was negligent in failing to erect a physical barrier around the perimeter of the restricted area in front of the dam. There was evidence at trial that such a barrier has been under consideration by the Corps of Engineers for some time and has been tested at another dam on the Mississippi River. Questions about the technical feasibility and effectiveness of the barrier plan, however, remain unresolved. The buoy-type barriers that have been tested have tended to collect debris discharged from the dam and have required costly measures to attach the buoys' anchors to the concrete floor of the river. Moreover, Corps officials expressed the fear that a physical barrier might actually exacerbate the danger by creating a convenient and secure place to which fishermen might lash their boats while fishing in the perilous waters below the roller gates. Rather than protecting unwary boaters from the danger of the backcurrent, a physical barrier mandated by the district court could create a kind of attractive nuisance worsening the situation. These considerations confirm that the decision whether to install such a barrier involves questions of practicability and feasibility (including cost) and is, therefore, somewhere within the ambit of the discretionary function exception. *See Griffin v. U. S.*, 500 F.2d 1059, 1064 (3d Cir. 1974). It would therefore have been improper to base liability on the government's failure to erect a physical barrier.

■ What we have said thus far, however, by no means suggests that the government is immune from liability no matter what safety precautions it chooses to take or ignore at Lock and Dam No. 8. This appears to be the contention of the government. Citing *Chute v. U. S.*, 610 F.2d 7, 13 (1st Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980), the government asserts that, "if the United States' executive discretion is to remain meaningful at all, its choice as to when to mark and what devices it will employ to mark the dam must in all ordinary cases be final." Brief for the United States, at 18.[10] We categorically reject this

---

9. Over 10,000 copies of each of several Corps of Engineers safety pamphlets were distributed to the public. *See* Gov't Exs. 3–A, 3–F. In addition, the boundaries of the restricted areas, the system of flashing lights and some of the dangers associated with boating in the vicinity of the dam were described to the public in press releases distributed to the news media. *See* Gov't Exs. 3–B, 3–D. Many of these publications were available to the public at Lock and Dam No. 8.

10. In *Chute*, an action was brought against the United States for wrongful deaths allegedly

arising out of the improper marking of a submerged wreck of a navy ship that had been deliberately run aground for use as a bombing target. Denying liability, the First Circuit rejected the plaintiff's contention that the government violated 14 U.S.C. § 86, which confers on the Secretary of Transportation, acting through the Coast Guard, discretionary authority to mark unremoved wrecks in navigable waters. In so holding, the court refused to second-guess the agency's exercise of discretion and concluded: "If the Coast Guard's ex-

suggestion that the government enjoys virtually unfettered discretion in the employment of warning devices. It is true, as we have indicated, that the discretionary function exception places some limits on what a court may command the government to do to avoid liability, but the exception is not so broad as to immunize every governmental decision, whatever its character. In particular, we believe that the reasonableness of specific warning systems is a matter susceptible to judicial scrutiny and we therefore conclude that the district court acted within its proper sphere in determining that the program of warnings implemented at Lock and Dam No. 8 was negligent and supported a finding of liability. Were we to hold otherwise, it would be "difficult to perceive which duties under tort law could not be avoided by a similar policy decision to ignore them." *Smith v. U. S.*, 546 F.2d 872, 877 (10th Cir. 1976).

■ Our analysis of the reasonableness of the warning system employed at Lock and Dam No. 8 begins with the Supreme Court's decision in *Indian Towing Co. v. U. S.*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), which held that the government's failure to maintain a lighthouse beacon in proper working order supported liability under the FTCA. Applying the "Good Samaritan" rule of tort law, the Court stated:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

350 U.S. at 69, 76 S.Ct. at 126. *See also Bearce v. U.S.*, 614 F.2d 556, 560 (7th Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980).[11] Thus, even if the government had no duty in the instant case to warn the public of the boating risks associated with Lock and Dam No. 8,[12] once it undertook to perform that safety function it became obligated to do so without negligence. The government's failure to use due care in warning the public of danger could therefore be the basis of liability.

■ After careful review of the record, we conclude that the warning sign installed on the face of the river wall at Lock and Dam No. 8, considered in light of the other warning devices and regulations pertaining to boating in the area, amounted to negligence on the part of the government, and that the negligence was a contributing cause of the deaths of the Callases.

---

ecutive discretion is to remain meaningful at all, its choice as to when to mark and what navigational aid to employ must in all ordinary cases be final." 610 F.2d at 13. This statement related to the question of a statutory duty, however, and not to the court's subsequent analysis of the case under the doctrine of *Indian Towing Co. v. U.S.*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The passage invoked by the government in the present case thus has little bearing on our analysis.

**11.** Although *Indian Towing* did not directly involve the applicability of the discretionary function exception, *see* 350 U.S. at 64, 76 S.Ct. at 124, we have utilized its Good Samaritan analysis as a measure of the exception's scope. *Bearce*, 614 F.2d at 560. *See also Somerset Seafood Co. v. U.S.*, 193 F.2d 631, 635 (4th Cir. 1951).

**12.** The government maintains that it had no duty to warn because the danger was open and obvious. *Empire District Electric Co. v. Rupert*, 199 F.2d 941 (8th Cir. 1952), *cert. denied*, 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344 (1953); *Little v. U.S.*, 290 F.Supp. 581 (E.D.La. 1968). We agree with the district court, however, that the danger to which the Callases fell prey was not open and obvious. Although the turbulence and choppiness of the water in front of the dam was surely visible, it was the barely discernible backcurrent that trapped the Callas' boat and carried it into roller gate no. 1. In any event, the government did in fact undertake to warn boaters of the dangers and may be held liable if it performed that function negligently.

We agree with the district court that the system of warnings at Lock and Dam No. 8 was inadequate because it failed to apprise boaters, such as the Callases, of the dangers awaiting them. The flashing amber and red lights could have provided little practical guidance as signals of danger because boaters knew that they could pass right by these lights on their way to perfectly authorized use of the auxiliary lock. In addition, the warning sign in place at the time of the Callas' accident did little if anything to alleviate the danger. As they entered the auxiliary lock, boaters could lawfully and, presumably, safely pass within a few feet of the river wall to which the sign was attached. In these circumstances, the message contained on the sign, "Danger—Keep Away 00 Feet," could reasonably have been interpreted in a number of ways not consistent with the actual risks confronting boaters. The government insists that the only possible construction to be placed on the sign was that boaters were admonished to remain somewhere between 100 and 900 feet away from the dam. But this is not the only reasonable interpretation and, since it assumes that boaters would have recognized the operational defect in the sign, is not in our opinion the most plausible reading. At trial, an expert witness testified that he understood the warning sign to mean that a danger once present had been removed, as indicated by the deletion of the digit "1". Alternatively, the sign could easily have been viewed as a warning to boaters not to come near the concrete bulkhead to which the sign was affixed. None of these interpretations fairly warns boaters of the risk of being carried by the eddy current out of the auxiliary lock area and then swept by the backcurrent into the roller gates. Thus, the chief defect of the sign is, as the district court noted, that it simply fails to specify the nature and source of the danger posed by the dam. In addition, the warning sign did not mark the limits of the restricted area as required by the Army regulations. 33 C.F.R. § 207.-300(s) (1981). For these reasons, the warning sign at Lock and Dam No. 8 constituted negligence by the government.[13]

The government argues that even if the sign evidenced negligence, it did not engender justifiable reliance by the Callases to their detriment and, thus, there can be no liability under the rule of *Indian Towing*. It is true that some type of reliance is necessary to establish that government negligence was a cause of the injury, *Inter-Cities Navigation Corp. v. U.S.*, 608 F.2d 1079, 1082 (5th Cir. 1979), but we conclude that there was reliance in the instant case. The purpose of a warning sign is to apprise the public of a danger; when boaters read the sign they reasonably expect that the danger awaiting them is the one described by the sign and not some other, undisclosed, danger. In the instant case, as we have noted, the Callases could reasonably have understood the warning sign, which they must have seen, in a number of ways that would not have revealed to them the risk of being drawn by the currents into the roller gates. Having no information about the nature of the real danger, the Callases were lulled into a false sense of security by the sign and so allowed their boat to drift in the auxiliary lock. Ultimately, we believe that this was a case in which the government induced reliance on a belief that it was providing something which, in fact, it was not providing—an adequate warning of the dangers posed by the dam. *See Chute v. U.S.*, 610 F.2d 7, 14 (1st Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980). We thus hold that the government's inadequate warnings constituted actionable negligence contributing to the Callas' deaths.

Our finding of liability in no sense constitutes an intrusion upon the type of decisionmaking authority withdrawn from judicial scrutiny by the discretionary func-

---

**13.** The district court also held that the failure of the warning sign to describe "what the danger is" violated government regulations. The regulations and safety standards that the court cited, however, do not apply to the warning sign in the instant case and, moreover, the message of the sign probably satisfied the very general requirements of these regulations and standards. *See* Pl. Ex. 37; Court Ex. 1.

tion exception. Our conclusion that a more adequate warning sign was necessary is not a policy judgment; the policy decision to erect warning signs has, of course, already been made by the government. But the government has no discretion to carry out its policies negligently.[14] Nor do we trespass in an area in which competing interests and fiscal restraints are at issue—we can perceive no policy served by a misleading warning sign and a rephrasing of the sign involves negligible public expense. Certainly, our finding of liability does not "seriously handicap efficient government operations." *United States v. Muniz*, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963).

### III.

Having rejected the argument that the discretionary function exception shields the government from liability, we turn briefly to two questions of causation. The government contends on two grounds that the negligence of the Callases was the sole and proximate cause of their deaths. We accept neither contention.

First, the government maintains that the sole and proximate cause of the drowning deaths was the failure of the Callases to wear proper life preservers. The government relies on the following finding by the district court: "There is no evidence that either of the decedents were wearing life jackets. Both of the decedents were good swimmers, and Benson arrived at the scene quickly enough to have saved them had they been afloat." Contrary to the government's assertion, this finding by the district court does not mean that the Callases would have been saved had they been wearing life preservers; it simply states that they would have been saved "had they been afloat." There was no evidence at trial that the wearing of life preservers would have kept the Callases afloat in the turbulent waters in front of the roller gates, where there was a strong undertow. Any assumption by the district court on this question would, therefore, have been with-

out record support. We thus reject the government's claim that failure to wear proper life preservers was the sole cause of the drownings.

Second, the government asserts that the Callases violated at least two other statutory or regulatory rules of conduct. The government says that the Callases failed to keep a proper look-out and failed to take precautions "required by the ordinary practice of seamen," all in violation of 33 U.S.C. § 351 (1976). In addition, the Callases violated 33 C.F.R. § 207.300(s) (1981), when they entered the restricted area in front of the dam. The government argues that such statutory fault precludes recovery by the Callases unless it can be shown that the fault could not have been a cause of the accident. *See First National Bank v. Material Service Corp.*, 597 F.2d 1110, 1117 (7th Cir. 1979) (in order to escape liability for a boat collision, a defendant guilty of statutory fault must prove that "the fault not only was not but *could not* have been a cause of the collision"). To suggest, however, that plaintiffs are unable to recover if their failure to meet the standards of "the ordinary practice of seamen" is a contributing cause of their injury is to say that contributory negligence bars recovery. This ancient common law principle is *not* the law of admiralty. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Under the principles of comparative negligence applicable to the instant case, the Callases are not denied relief simply because they did not observe standards of good seamanship. In addition, the simple fact that the Callas' boat entered the restricted area does not bar their recovery when the government's own negligently maintained warning sign is partly responsible for this regulatory violation. We thus hold that the statutory fault alleged by the government does not bar recovery by the Callases.

### IV.

The district court found all parties involved in this case to have acted negligent-

---

**14.** *Cf. Somerset Seafood Co. v. U.S.*, 193 F.2d 631, 635 (4th Cir. 1951) ("There is certainly no discretion to mark a wreck in such a way as to constitute a trap for the ignorant or unwary rather than a warning of danger.").

ly, and it apportioned liability among them "proportionately to the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251 (1975). We think it would have been reasonable for the district court to have apportioned fault as it did without regard to the government fault immunized as an exercise of a discretionary function. After all, the Callases were in effect exposed to many of the hazards resulting from the immunized policy decisions when they were misled by the negligently maintained warning sign. But we leave to the district court a formal determination of the respective faults in light of the fact that some government conduct cited by the district court was immunized under the discretionary functions doctrine.

We therefore vacate the portion of the district court's opinion pertaining to apportionment of fault and remand the cause for whatever further consideration of the apportionment issue may be appropriate in light of this opinion. In all other respects the judgment is affirmed.

Affirmed In Part. Vacated And Remanded In Part.