Pamela GRAVES, et al.,
Plaintiffs–Appellants,

v.

The UNITED STATES of America,
Defendant–Appellee.

No. 88–5084.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 7, 1989.

Decided April 6, 1989.

David L. Huff, Larry Deener, Landrum, Shouse & Patterson, Lexington, Ky., W.R. Patterson, Jr., argued, King & Patterson, Louisville, Ky., for plaintiffs-appellants.

Louis DeFalaise, U.S. Atty., Marianna J. Read, Asst. U.S. Atty., Office of the U.S. Atty., Lexington, Ky., Stephanie Grogan, Trial Atty., U.S. Dept. of Justice, Torts Branch, Civ. Div., Barbara B. O'Malley, argued, Washington, D.C., Jennifer M. Payton, Asst. Dist. Counsel, U.S. Army Corps of Engineers, Louisville Dist., Louisville, Ky., for defendant-appellee.

Before MILBURN and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.

BOGGS, Circuit Judge.

Plaintiffs appeal the district court's judgment denying recovery in a tort action

against the United States for injuries allegedly caused by inadequate warnings about a dam on the Kentucky River. We affirm.

I

Lock and Dam No. 11, on the Kentucky River, was constructed between 1904 and 1906 by the United States Army Corps of Engineers (the "Corps"). Since that time, it has been continuously controlled and supervised by the Corps. All responsibility for warning devices rested with the Corps.

Lock No. 11 is located just around the third of a series of sharp curves in the Kentucky River. The distance from the last curve to the crest of the dam is about 1600 feet. When approaching the dam, a boater is faced with the optical illusion that the river continues straight ahead, making the dam very difficult to perceive.

In 1961, the warning system at Lock No. 11 consisted of a sign painted on the upper end of the guide wall that stated "Danger, High Dam" that was in yellow and black lettering, a sign downstream at the lower guide wall that stated "Danger, High Dam, Stay Away," and a sign posted on a tree 1000 feet up river of the dam stating "Danger, High Dam 1000 feet, Keep to the Right."

In 1973, acting pursuant to orders from the head of the Ohio River Division of the Corps of Engineers to increase the warning at certain water areas, the Louisville District installed two warning buoys upstream from the dam at Lock No. 11. The buoys were 13 inches in diameter, rose 36 inches out of the water, and had "Danger Dam" painted on them. The buoys were also placed diagonally across the stream in order to steer boaters to the right of the dam towards the lock.

In July 1981, the Corps decided to close the locks on the Kentucky River due to their rising cost per use. This information was disseminated in the classified section of the Louisville and Lexington newspapers, as well as being mailed to all those who were on the mailing list of the Corps. This list included 1822 individuals and organizations who had requested that their names be put on the mailing list or who had purchased a navigational chart.

After the locks were closed, the warnings were revised as well. The Secretary of the Army delegated ultimate responsibility for formulating a new warning system to the Kentucky District. This responsibility was to be exercised by the District Engineer and his associates. Larry Dickson, chief of the Waterways Management Branch of the Louisville District, made inquiries of counsel regarding the legal responsibility for deactivating or maintaining certain of the warnings, considered the costs and feasibility of maintaining the warning buoys and the upstream sign, and forwarded his recommendations to the Chief Engineer. Pursuant to his recommendation, the buoys were removed because, without the locks, Dickson felt that it would be difficult to repair or fix the heavy chains that held them in place. In addition, the sign 1000 feet away from the dam on the tree was also removed for maintenance reasons. The only sign that was left was on the lock structure itself. This sign was subject to possible submersion if the water level rose too high.

On May 14, 1983, the water level on the river was running 5½ feet above the level of the dam. As a result the word "Dam" and possibly part of the word "Danger" on the warning sign was submerged. On this day, Larry Graves, his wife Pamela, and their son Darren were on the river for a boat ride. Larry Graves was operating the boat. Darren Graves was in the left-hand seat behind the windshield, and Pamela Graves was reclining on a bench seat in the front of the boat. Pam and Darren had on life jackets, but only Darren's was fastened. Larry Graves was not wearing a life jacket. For the majority of their ride, they stayed in the middle of the river. They only noticed one warning sign, one about underwater cable crossings.

Pamela Graves testified that no one saw any warnings, and that they realized the danger of the dam only approximately ten feet away from the dam drop-off, the point where it first becomes visible. Ms. Graves further testified that she could tell that her

husband also noticed the drop-off because of the look on his face before they went over the dam. Witnesses on the bank of the river testified that it appeared that Mr. Graves had put the engine into reverse to try to avoid the dam. The boat went over the river, and Darren's and Pam's life jackets were ripped off of them. However, they both managed to reach the shore with help from others on the bank. Larry Graves's body was discovered ten days later at a site thirty miles from the accident.

Pamela Graves filed suit in federal district court under the Suits in Admiralty Act ("SIAA"), 46 U.S.C.App. §§ 741–752, on behalf of herself, her deceased husband, and her minor child. During trial, the government initially argued that the district court lacked subject matter jurisdiction because the "discretionary function exception" shielded the U.S. from this type of tort action based on admiralty claims. The court held that the United States was not immune from suit in the present case, but that it had provided sufficient warnings through notice, publications, and the remaining sign so that there was no breach of duty, and thus no negligence. The court went on to hold that, in any event, the Graveses' behavior was the proximate cause of the accident.

## II

Generally, when reviewing a district court's determination of negligence in an admiralty action, this court is not to overturn that finding unless it is clearly erroneous. *In re Paducah Towing Co., Inc.*, 692 F.2d 412, 421 (6th Cir.1982). A finding is "clearly erroneous" if the reviewing court is left with the definite and firm conviction that a mistake has been made after examining all of the evidence. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, ·105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

In the present case, the district court determined that there was no negligence on the part of the Corps because it had met its duty to warn of any hazards associated with the closing of the locks. Specifically, the district court concluded that the removal of the buoys was reason-

able in light of the difficulty of repair, and that the warning sign on the dam, the notices published in the paper, and the navigational guidebooks of the Corps were adequate warning of the danger. The court also found that the Graveses were the proximate cause of the accident; specifically, that the boat was travelling too fast, there was a failure to keep a lookout, and a failure of Mr. Graves to wear a life vest.

These factual findings are not clearly erroneous because there was credible evidence on the record to support these findings. There was evidence that the boat may have been travelling above a safe speed because of Darren Graves's testimony of how the boat was planing coupled with expert testimony concerning the speed required for planing; there was expert evidence that a life jacket might have prevented the death of Mr. Graves; there was evidence from Pamela Graves's testimony that no one on the boat was keeping a lookout; and there was expert evidence that the buoys could not be repaired and maintained when the locks were closed. Similarly, the district court's determination regarding the adequacy of the warnings is not clearly erroneous. The court below correctly took notice of the fact that, at least in this circuit, boaters are charged with the use of navigational charts. *See Gemp v. United States*, 684 F.2d 404, 408 (6th Cir.1982). We believe the district court's finding of this knowledge coupled with the remaining warning sign reasonably satisfies any duty to warn.

Although there is evidence that a life jacket might not have saved Larry Graves or that a warning sign further upriver might have helped prevent this tragedy, it is not this court's duty to try the case *de novo*. Therefore, though we might have made different findings of fact, we are not under the "firm conviction that the district court has made a mistake," and therefore the findings of fact are not clearly erroneous. *See Paducah Towing*, 692 F.2d at 421.

## III

Even if we felt the district court's determination of negligence to be clearly errone-

ous, we would dismiss the suit because of a lack of subject matter jurisdiction. The court below held that the conduct of the United States in determining and implementing safety precautions after the closure of Lock No. 11 was not immune from suit because the decisions were not "discretionary functions" under the Suits in Admiralty Act. We disagree.

■■■ The district court does not have jurisdiction under the Federal Tort Claims Act for claims against the United States if the alleged negligence consists in flaws in the government's performance of a discretionary function or duty. *Myslakowski v. United States*, 806 F.2d 94, 96 (6th Cir. 1986); 28 U.S.C. § 2680(a). This discretionary function exception also applies to the SIAA under which this case is brought. *Chotin Transportation v. United States*, 819 F.2d 1342, 1347 (6th Cir.1987) (en banc). Factors to consider when determining whether the discretionary function exception applies include the nature of the conduct, that is whether Congress intended it to be shielded from tort liability, and whether the actions of the government are as regulator of the conduct of private individuals. *United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 2765, 81 L.Ed. 2d 660 (1984). Discretionary decisions are decisions that involve policy, not simply any decision that a government agency or employee makes. *Berkovitz by Berkovitz v. United States*, 486 U.S. ___, 108 S.Ct. 1954, 1960, 100 L.Ed.2d 531 (1988). This analysis is basically *ad hoc*, and depends on the facts of each case. *Chotin*, 819 F.2d at 1346.

■■ In the present case, the district court determined that the safety precautions taken after the locks were closed were not based on discretionary decisions, relying on this court's opinion in *Chotin Transportation v. U.S.*, 819 F.2d 1342 (6th Cir.1987). That reliance was misplaced. In *Chotin*, this court determined that the United States could be sued for negligence if a lockmaster did not properly control, manage and supervise locking procedures for barges going through the locks. *Id.* at 1347. This court noted that the discretion-

ary function exception does not insulate all decision making; specifically, when a governmental entity assumes a job pursuant to governmental policy, that job is to be completed according to the policy, and not with unbridled discretion. Apparently, the district court found the safety precautions taken pursuant to the decision to close Lock No. 11 comparable to the activity of the lockmaster in *Chotin* after he had been trained in the operation of the locks. The similarity, if any, is illusory.

Unlike *Chotin*, the facts of this case strongly suggest the applicability of the discretionary function exception because policy decisions were made about what type of warnings were effective and cost-justified, considering that Lock No. 11 was to be closed. In *Chotin*, there had been a policy decision to operate the locks in a certain manner, which the lockmaster negligently failed to carry out. In the present case, there was no policy established by higher authority regarding the type of warnings needed at the site of a closed lock. Instead, the Louisville District exercised policy discretion in arriving at the appropriate type of warnings. Dickson considered the cost, feasibility of maintenance and effectiveness of various types of warnings. His final recommendation, adopted by his superiors, was quintessentially a choice among competing considerations, not merely an execution of policy received from above. This distinction may be illustrated further by examining this court's decision in *Myslakowski*.

In *Myslakowski*, this court determined that a failure to warn buyers of surplus United States Postal Service jeeps of the tendency of the jeeps to turn over was a discretionary function intimately related with the decision to sell the jeeps. *Myslakowski*, 806 F.2d at 97; *see also Jurzec v. American Motors Corp.*, 856 F.2d 1116, 1118 (8th Cir.1988) (decision to sell surplus postal jeeps was discretionary). In the present case, the decision not to place other warning signs near the dam was intimately connected with the decision to close the locks. Indeed, the district court may have implicitly applied this analysis when it de-

termined that the government did not have a duty to maintain the warning buoys because of the difficulty of buoy maintenance without the presence of the locks. Certainly, the difficulty in maintaining the buoys, a safety consideration, is related to the government's decision to close the locks, a discretionary decision.

The district court has made the mistake of applying the "discretionary function exception" only to the highest-level decisions and finding all implementation of those decisions to be not discretionary. This is too rigid a determination that does not adequately take into account the facts of this case. As the Supreme Court stated in the seminal case of *Dalehite v. United States*, 346 U.S. 15, 35, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953),

> [T]he "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. (footnote omitted).

As this court recently reaffirmed, " 'even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.' " *In re Ohio River Disaster Litigation*, 862 F.2d 1237, 1247 (6th Cir.1988) (quoting *Myslakowski*, 806 F.2d at 97). Therefore, we hold that the district court lacked subject matter jurisidiction to hear this case.

CONTIE, Senior Circuit Judge, concurring in the judgment and joining in part.

I concur in the majority's judgment affirming the district court's dismissal of appellants' claim. I join in the majority's analysis in part II of its opinion. I am, however, unable to agree with the majority's analysis in part III of its opinion. For this reason, I write separately.

*Estate of Callas v. United States*, 682 F.2d 613 (7th Cir.1982), presented issues similar to those in the instant case in many respects. In that case, the Seventh Circuit reasoned as follows with respect to the application of the discretionary function exception to the government's lock and dam warning systems:

> [W]e believe that the reasonableness of specific warning systems is a matter susceptible to judicial scrutiny and we therefore conclude that the district court acted within its proper sphere in determining that the program of warnings implemented at [the lock and dam] was negligent and supported a finding of liability. Were we to hold otherwise, it would be 'difficult to perceive which duties under tort law could not be avoided by a similar policy decision to ignore them.'

*Id.* at 622 (quoting *Smith v. United States*, 546 F.2d 872, 877 (10th Cir.1976)). Analogizing to the Good Samaritan rule, the court held that even if the government had no duty to warn the public of the boating risks associated with the lock and dam involved in that case, once it undertook to perform that safety function it became obligated to do so without negligence. *Id.* The court continued, "The government's failure to use due care in warning the public of danger could therefore be the basis of liability." *Id.*

I would hold that in the instant case, as in *Callas*, the reasonableness of the warning system chosen by the government as well as any negligence in its implementation is susceptible to judicial scrutiny. However, since I am of the opinion that the majority is correct in its analysis of part II, and since part II represents a separate and independent alternative holding, I concur in the court's judgment.