**ARKANSAS RIVER COMPANY,**
Plaintiff,

v.

**CSX TRANSPORTATION, and United States of America, Defendants.**

**Civ. A. No. C90–0024–P(J).**

United States District Court,
W.D. Kentucky,
Paducah Division.

April 25, 1991.

Ernest Lane, III, Greenville, Miss., Mark C. Whitlow, Whitlow, Roberts, Houston & Russell, Paducah, Ky., for Arkansas River Co.

John E. Wells, IV, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

E. Spivey Gault, Lake, Tindall, Hunger & Thackston, Paducah, Ky., for CSX Transp.

## MEMORANDUM OPINION

JOHNSTONE, District Judge.

On the night of December 10, 1986 at Mile 79.6 on the Green River, the M/V MARY ANN HARBISON and its tow struck the Smallhaus Bridge. The bridge is protected by concrete piers encased in steel rubbing beams commonly known as a "fender system." The fender system protects the bridge from damage due to marine traffic and is designated as an "aid to navigation" on all navigational charts and blue prints of the United States of America. At the time of the accident, the Harbison was under the command of Capt. Charlie T. Brown who had worked on the Green River for approximately five years. The Harbison was his regular boat and he was familiar with its operating characteristics. The Harbison's tow was four loaded coal barges drawing 8½' to 9' of water with approximately 3' of freeboard.

Since there was no radio communication at the bridge a determination whether the bridge was open or closed could not be made until rounding the bend. This situation was complicated by the fact that the bridge was located in a "blind bend." A tow was upon the bridge immediately after rounding the bend. This made it dangerous, if not impossible, to drive the bend and required that a downbound vessel "flank" the bend. A vessel flanks a bend by reversing its engines and pointing the stern slightly toward the bank on the inside of the bend allowing the pilot to control of the tow while the current carries it around the bend.

Normal pool elevation on this stretch of the Green River is 9.0' (366 feet Mean Sea Level) and flood stage is 23.9'. At the time of the accident, the river stage was 18.7' (377 feet M.S.L.), 4.1' above the previous day's reading and 1.3' above the last reading taken 9 hours earlier. Horizontal clearance through the channel span of the bridge is 110 feet and the Harbison's tow was approximately 70 feet wide.

Capt. Brown was aware of these rising river conditions as he proceeded downbound full ahead from Mile 85 or 86 until he reached Mile 81, approximately 1½ miles above the bridge. There he set up to "flank" the bend. When the tow drifted around the bend and into position, Capt. Brown pushed both sticks full ahead intending to drive through the channel span. However, the starboard engine failed to respond. The tow set over to starboard and laid up against the fender system. The initial impact was so slight that people standing in the wheelhouse did not lose

their balance. As the vessel began to slide through, the protruding, jagged steel members of the fender system holed and "grabbed" the starboard stern barge. The tow broke up and the port stern barge struck the left channel pier displacing it approximately 22 inches. Although all the barges were recovered downstream, the starboard stern barge later sank at its mooring.

The Harbison was owned by Arkansas River Company, the bridge was owned by CSX Transportation, and the fender system was constructed and maintained by the United States of America. Arkansas River sued the U.S. for damage to the barges, and CSX sued the U.S. for damage to the bridge. The U.S. counterclaimed against Arkansas River for damage to the fender system. The stipulated cost of repairs to the Smallhaus Bridge is $150,000.00. The stipulated damage incurred by Arkansas River Company for repairs, salvage, survey fees and lost cargo is $80,741.49.

The U.S. claims its decisions regarding the maintenance and inspection of the fender system are discretionary and fall within an exception to the United States' waiver of sovereign immunity in the Federal Tort Claims Act. This exception has been incorporated into the Suits in Admiralty Act. *In re Ohio River Disaster Litigation*, 862 F.2d 1237 (6th Cir.1988). If a case falls within the exception, the Court lacks subject matter jurisdiction and the case must be dismissed. *Myslakowski v. United States*, 806 F.2d 94 (6th Cir.1986).

The discretionary function exception provides that the U.S. shall not be liable for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function...." 28 U.S.C. 2680. Since every action or inaction by the government involves some exercise of discretion, a planning/operational distinction has been articulated to determine whether the action falls within the exception. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *In re Ohio River Disaster Litigation*, 862 F.2d 1237 (6th Cir.1988). Planning decisions, which involve questions of policy, and the

evaluation of the financial, political, economic and social effects of a given policy, are immune from judicial scrutiny. On the other hand, operational decisions, which involve the normal day-by-day operations of the government, are subject to judicial scrutiny. *Complaint of Walker's Midstream Fuel*, 636 F.Supp. 339 (W.D.Ky. 1986). The basic inquiry is whether the challenged acts are of the nature and quality that Congress intended to shield from liability. *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Decisions regarding inspection can either be planning or operational decisions. *Varig Airlines*, 104 S.Ct. at 2755; *In re Ohio River Disaster Litigation*, 862 F.2d 1237 (6th Cir.1988); *Complaint of Valley Towing Service*, 609 F.Supp. 298 (D.C.Mo.1985). In *Varig Airlines*, plaintiffs were injured in an airplane fire. The Federal Aviation Administration had instituted a compliance review procedure to insure airplane manufacturers complied with the safety regulations. This procedure included a "spot check" inspection program. Plaintiff claimed that the "spot check" inspection program should include more frequent inspections. The Court found that the frequency with which to inspect was a policy decision and immune reasoning that "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig Airlines*, 104 S.Ct. at 2767.

This holding was followed in the *Complaint of Valley Towing Service*. There a boat ran into a bridge on which vertical lights marked the underlying channel span as required by the regulations. Since the bridge was maintained by the state of Missouri, the state had retained the duty of insuring compliance with the regulations. The Coast Guard was responsible for policing compliance and inspected the bridge approximately twice monthly. When the Coast Guard discovered that one of the lights was not working, it notified the state

and broadcast a warning to navigators. It was undisputed that the Coast Guard followed their established inspection policy, Plaintiff merely alleged that more frequent inspections were needed. The Court, following *Varig Airlines*, found that the frequency of inspection in a compliance review is a policy decision and immune.

However, in *In re Ohio River Disaster Litigation*, the owners of property damaged by the rush of water after ice jams broke sued the United States for the negligence of the Army Corp of Engineers. The Court found that the failure to restrict the flow, the failure to coordinate ice passing activities between dams, and the failure to compensate for the immobilization for the submergible tainter gates were policy decisions and immune. However, the failure to conduct periodic inspections, replace a broken latch pin, and to sufficiently train lock personnel were non-policy decisions and subject to judicial scrutiny. In making this decision the Court stated that "we do not deviate from the principle that the character of the decision, and the identity of the decisionmaker, determines whether the discretionary function exception applies." *Id.* at 1247. The distinction was that the policy decision involved the balancing of articulable competing needs.

This case closely parallels the *Complaint of Walker's Midstream Fuel*, 636 F.Supp. at 339. There a tow boat struck the dam due to the outdraft at the lock. The Court found that although decisions regarding the design and construction of the dam were immune, decisions regarding the maintenance and operation of the dam were subject to judicial scrutiny. The Court reasoned that

> [t]he United States constructed the ... Dam as an aid to navigation.... The government had no duty to provide such a navigational aid. However, after it exercised its discretion and constructed the locks and dam, it was obligated to exercise due care in their maintenance and operation and subjected itself to liability for negligent performance of those activities.

(Citations omitted). *Complaint of Walker's Midstream Fuel*, 636 F.Supp. at 349.

Following the teachings of the above cases, the Court finds that the inspection and maintenance of the fender system are operational decisions and subject to judicial scrutiny. *Varig Airlines* and *Valley Towing* are distinguishable. In both *Varig* and *Valley Towing* the government was inspecting private parties to ensure compliance with government regulations. There the government had established a policy regarding inspections and there was evidence that the U.S. performed the inspections in accordance with the established policy. Here the U.S. owned and maintained the fender system and there was no evidence of a policy regarding inspections and maintenance. The U.S. cannot construct a fender system in the middle of a busy river and claim that its decision to inspect and maintain the fender system infrequently, if ever, is discretionary. The discretionary function exception does not apply and the Court has jurisdiction.

■ Having decided the question of jurisdiction, the court will now address the merits. The U.S. argues that: 1) the allision with the Smallhaus Bridge raises a presumption of negligence; 2) Capt. Brown was negligent in his operation in that: a) he did not take the barges through two at a time and b) he should have been aware that neither engine was producing full power; and 3) the tow boat did not have sufficient power. These will be addressed in reverse order.

The U.S. argues that the Harbison did not have sufficient power to ensure an adequate margin of safety to maneuver this tow in the current at the Smallhaus Bridge, and the Harbison must not have been properly maintained. However, no evidence has been produced substantiating any of these claims. The Court finds that the Harbison was properly maintained and had sufficient power to handle four barges in swift water.

The U.S. also argues that Capt. Brown was negligent in taking four barges through the bridge given the severe river conditions on the night of the accident.

The U.S. suggests that Capt. Brown could have taken the barges through two at a time. However, the U.S. does not cite any case law or produce any testimony showing that Capt. Brown was negligent in taking four barges through the bridge on the night in question. In fact, in the Coast Guard license revocation hearing the Administrative Law Judge specifically found that Capt. Brown was not negligent. That tribunal found and this Court agrees that although it was a difficult bridge on a tough river, especially in swift current, Capt. Brown made this bridge almost every day and had made the bridge in similar conditions. The failure of his starboard engine was a situation of which he could not have been previously aware.

■ The U.S. is correct that in admiralty, a moving vessel is presumed at fault when it collides with a visible stationary object. *American PetroFina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir.1988). However, if the structure was designed to come in contact with ships, "the contact must rise above a certain minimal level before it constitutes a collision at all and activates the presumption." *American PetroFina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988). Here the fender system was designed to protect the bridge from damage as a result of collision. Because of the lightness of the initial contact, the Court finds that the allision between the vessel and the fender system was not sufficient to raise the presumption of fault.

■ Even if raised, the moving vessel may rebut the presumption by showing that the collision was an inevitable accident. *American PetroFina Pipeline Co.*, 837 F.2d at 1324. When a collision results from the failure of a ship's engine, the defense of inevitable accident prevails if the defect could not have been discovered by the exercise of due diligence. *Micma Motorship Corp. v. Cabaneli Naviera, S.A.*, 477 F.Supp. 45 (E.D.La.1979) (citing *Oil Transfer Corp. v. Atlantic Tankers, Ltd.*, 194 F.Supp. 920 (S.D.N.Y.1960), aff'd, 297 F.2d 367 (2nd Cir.1962)). The Court finds that the failure of the starboard engine was an inevitable accident which would rebut the presumption.

## CONCLUSION

The fender system was built to protect the bridge abutment and act as an aid to navigation. Although the U.S. had no duty to provide this aid to navigation, the U.S. was obligated to exercise due care in the maintenance and operation of the fender system and subjected itself to liability for the negligent performance of these activities. Because the fender system was not inspected and maintained, the protruding steel beams, hung and holed the starboard stern barge causing the break up of the tow and the damages sustained by Arkansas River. The break up of the tow also allowed the port stern barge to strike the left bridge pier causing the damages to CSX.

For these reasons, the Court awards judgment to Arkansas River and CSX against the United States and dismisses the United States' counterclaim against both Arkansas River and CSX. An appropriate order will accompany this opinion.