## CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Bay Towing Corp. et al.

March 2, 1998

Case No. (Law) L97-1079

BY JUDGE LYDIA CALVERT TAYLOR

Trial in this admiralty suit was held January 13-15, 1998, before this court, sitting without a jury. The court agreed to bifurcate the case and hear evidence only as to liability. At the close of evidence and argument by both sides, the court took the matter under advisement, agreed to consider briefs if the parties wished to cite authority beyond that cited in closing arguments, and stated it would render a written opinion on liability. For the reasons set forth in this letter opinion, the court finds no negligence and renders its judgment in favor of all named defendants: Bay Towing Corporation; Robbins Maritime, Inc.; Hale Intermodal Marine Company; Glenn R. Wactor; and Bennie G. Dize.

*Facts*

The facts of this case are somewhat complicated and will be described in some detail. This matter arises from an allision of a flotilla of two tugs and a barge with the fender system encasing the piers of the Berkley Bridge in Norfolk. The fender system consisted of protective wooden railings or gratings designed to keep vessels passing under the bridge from coming into direct contact with the bridge's concrete pillars. Due to the circumstances of the allision, the only witnesses were the members of the crews of the boats within the flotilla. The flotilla consisted of the command tug

*Southern Branch*, the support tug *Delilah*, and the barge in tow *Liberty Trader*. The entire flotilla, pursuant to maritime custom, was under the command of the captain of the *Southern Branch*, defendant Glenn Wactor. Defendant Bennie Dize was captain of the *Delilah* and, as such, played a subordinate command role to Captain Wactor. This court was provided no information as to who, if anyone, was aboard the *Liberty Trader*.

The *Southern Branch* and the *Delilah* left Bay Towing's dock on March 29, 1992, heading east under the Berkley Bridge toward Whitehorse Marine, where the *Liberty Trader* was docked. On the journey to Whitehorse, Captains Dize and Wactor each noticed a small gap in the fender system under the bridge on the north side of the bridge. At Whitehorse, the *Southern Branch* and the *Delilah* "made fast," or were fastened by ropes, to the *Liberty Trader*, with both tugs on the port side of the barge. The barge was towed in such a fashion that the stern of the barge faced forward, creating what is called the "working bow" of the flotilla. Thus, once made fast, the tugs were on the "working starboard" side of the flotilla.

Proceeding in such a fashion, with the *Delilah* closer to the bow of the flotilla and the *Southern Branch* closer to the stern, the flotilla maneuvered away from the dock at Whitehorse Marine. Captain Wactor commanded the flotilla to make a one hundred eighty degree starboard turn in order to head toward the Berkley Bridge and to position the flotilla correctly for passage under the bridge. The turn was made without incident, and the flotilla entered the opening of the bridge, at approximately a ten degree "crabbing" angle, according to Wactor. The plan for transiting the bridge was to arc through the narrow span, entering at an angle, coming close to the northern fender system of the bridge, then turning the flotilla sharply to port to exit the span.

Unfortunately, when he turned the *Southern Branch's* rudder to create the arc, Captain Wactor discovered that her steering system had failed. Wactor attempted to notify the *Delilah* by radio, but the *Delilah* received no message. When Wactor notified his chief engineer, Richard D. Regambal, that he had lost steering, Regambal quickly went to the steering system to investigate. Meanwhile, Captain Dize took independent action to move the flotilla away from the fender system when he realized an allision was imminent. However, because the *Delilah* is a single-screw tug,[1] Dize was unable to move the flotilla without creating risk of an allision between the

---

[1] A single-screw tug like the *Delilah* has only one engine, while a double-screw tug like the *Southern Branch* has two engines.

*Delilah* and the bridge. Captain Wactor attempted to steer the flotilla by using the engines of the *Southern Branch*, which is a more powerful double-screw tug; he placed its starboard engine in full forward and the port engine in full reverse, attempting to create enough turn in the flotilla's approach to avoid allision with the fenders. This engine maneuver in fact did succeed in turning the flotilla but not in time to avoid an allision with the bridge.

Regambal was able to restore steering to the *Southern Branch* within an estimated twenty seconds of notification of the steering problem. He raced to the area of the steering mechanism, where he discovered that a weld had broken at the base of the rudder angle-indicator arm, which had caused the arm to fall away from its normal position within the steering system, which, in turn, had caused the steering to fail. Regambal was able immediately and easily to repair the problem by replacing the arm in position, which restored steering control and enabled the *Southern Branch* and the rest of the flotilla to complete their journey. The weld, it was later found, had rusted away on its underside, a part not visible on examination; the visible part of the weld, on the top, was intact and showed no unusual rusting at all. According to the testimony at trial, no one on the *Southern Branch's* crew in fact knew that the weld was failing until it actually failed, nor could they have known, according to the testimony of expert witnesses.

### *Law*

As this court was presented no case law from the courts of this Commonwealth on which it might rely, it turned instead for persuasive precedent to the federal court system, in which by far the greatest number of admiralty cases are brought. In particular, this court has relied on opinions from the United States Court of Appeals for the Fifth Circuit, which has long had a reputation as the preeminent admiralty court in the country.[2]

The Fifth Circuit quite succinctly summarized the general maritime principles regarding allision in *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324 (5th Cir. 1988).

Under general maritime law and the law of this Court, there is a long-standing presumption that, when a moving ship collides with

---

[2] Of course, the Court of Appeals for the Fourth Circuit was accorded respect as well, as the federal appeals court whose geographic area encompasses Virginia and the court whose judgments frequently require application of Virginia law.

a stationary object, the moving ship is at fault. This presumption operates to shift the burden of proof — both the burden of producing evidence and the burden of persuasion — onto the moving ship. The moving ship may rebut the presumption by showing, with a preponderance of the evidence, that the collision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the collision was an unavoidable accident. Ultimately, the presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way.

*Shoko Maru*, 837 F.2d at 1326 (citations omitted). Therefore, a defendant can rebut the presumption, if applicable, by proving any one of three things exist; here, the defendants seek to show either or both of the last two possible defenses: the tug acted with reasonable care or the collision could not have been avoided. Either of these two circumstances, which are related, act to rebut any presumption to which the plaintiff may be entitled.

The Fifth Circuit in *Shoko Maru* went on to state, however, that any "contact must rise above a certain *minimal* level before it constitutes a collision at all, thus activating the presumption." *Id*. (emphasis supplied). That appellate court cited several district court cases within its jurisdiction in which ships had been held not liable for allisions in which ships damaged parts of wharves or docks designed to absorb impacts or which were already damaged before the ship allided with the nonmoving object. *Id*. The defendant has argued that, based on the federal trial court precedent cited by the Fifth Circuit in *Shoko Maru*, the contact between the flotilla and the bridge fender in the instant case does not rise to the level of force to qualify as a collision and for the claimant thus to be entitled to the rebuttable presumption of negligence by the defendant tug. The reasoning of these cases is that fender systems anticipate and are designed for minor contact, and such expected contact does not constitute a "collision" but rather a daily, ordinary, expected occurrence.

This court is unwilling, however, to set down a presumption that all fender systems of all bridges are designed to withstand impacts of a certain magnitude or to find as a fact that the impact in this case was of such a small magnitude as to dispel the presumption of fault on the part of the moving vessel. In addition, no evidence was presented of prior contact with or damage to the Berkley Bridge fender system except some passing references in the testimony of the defendants Wactor and Dize. Therefore, this court will accord the claimant the benefit of a presumption of fault on the

part of the moving vessel here, although recognizing that it is a close issue.[3] However, because this court further finds, by a preponderance of the evidence, for the reasons outlined below, both that the tug *Southern Branch* acted with reasonable care under the circumstances and that the allision was an unavoidable accident, the presumption of negligence raised by the occurrence of an allision in this case is rebutted.

Judge Johnstone in *Arkansas River* went on to cite the Fifth Circuit case of *Shoko Maru* in additional support of his ruling: "[T]he moving vessel may rebut the presumption [of fault on the part of the vessel] by showing that the collision was an inevitable accident. When a collision results from the failure of a ship's engine, the defense of inevitable accident prevails if the defect could not have been discovered by the exercise of due diligence." *Arkansas River*, 780 F. Supp. at 1142. Similarly here, the steering failed due to a steering arm defect that could not have been discovered with due diligence, and thus the collision with the Berkley Bridge was an inevitable accident.

The Fourth Circuit has set the standard for a tug master/owner: "[he] is obligated to perform his duties with such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings, and with such consideration as special circumstances may require." *Curtis Bay*

---

[3] The principal case cited by the defendant at trial for its argument that the contact was too slight to qualify as an allision and thus be entitled to a presumption was *Arkansas River Co. v. CSX Transp.*, 780 F. Supp. 1138 (W.D. Ky. 1991). That court ruled, based on a number of factors, that the collision was not sufficient to give rise to a presumption of negligence; this court, in contrast, found that the factors on which the United States District Court's findings against a presumption were based did not exist here. Based on the particular facts of the case, Judge Johnstone concluded: "The fender system was built to protect the bridge abutment and act as an aid to navigation. Although the U.S. had no duty to provide this aid to navigation, the U.S. was obligated to exercise due care in the maintenance and operation of the fender system and subjected itself to liability for the negligent performance of these activities." *Arkansas River*, 780 F. Supp. at 1142. However, the facts in our case distinguish it from those in *Arkansas River*. In *Arkansas River*, "the initial impact [of the boat] was so slight that people standing in the wheelhouse did not lose their balance." *Id.* at 1139-40. The fender system had a defect – an existing break – so that its "protruding, jagged steel members ... 'grabbed' the ... barge ..." breaking up the tow and propelling the barge into one of the piers, which was damaged. *Id.* at 1140. Thus, the original bump would probably have caused no damage to the fender system, just as was its design, had there not been a defect in the fender system itself. That is not the case here, where there was no persuasive proof as in *Arkansas River* that any fender system defect was the real cause of the damages, as the damage would have otherwise been slight.

*Towing Co. v. Southern Lighterage Corp.*, 200 F.2d 33, 35 (4th Cir. 1952) (citations omitted). The question thus becomes whether the tug company, in its maintenance, and Captain Wactor, in the way in which he set up, operated, and steered the flotilla, utilized reasonable care and maritime skill under the special circumstances of this case. Plaintiff pointed out in its opening statement four areas in which it believed Wactor failed to use reasonable care: (1) his failure to properly maintain the tug and/or the steering mechanism, so as to avoid steering failure; (2) his improper approach to the bridge; (3) his failure to assess weather conditions by calling the airport for a forecast in order to plot an approach to the bridge with the weather factor properly calculated; and (4) his failure to timely respond to and correct the failure of the steering device.

The Court of Appeals for the Seventh Circuit has stated that the presumption of fault upon the moving vessel "must be applied in a 'common sense' manner that is rooted in 'logic and experience'." *Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037, 1050 (7th Cir. 1995) (quoting *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir. 1977)). This court must apply that standard to the evidence involved in each of plaintiff's claims. The first of plaintiff's claims is that the steering mechanism was not properly maintained. However, all the evidence was that proper maintenance, such as oiling moveable parts on a regular basis, was performed properly. The evidence was that the breakage of the steering arm came from rusting that was not visible and could have been neither seen nor anticipated in the exercise of reasonable care. The defendants' evidence of proper maintenance and inability to anticipate the steering failure suffices to rebut successfully the presumption of negligence raised by the fact of the allision.

Plaintiff's second claim is that Captain Wactor should have aligned the tow for a straightforward approach to the bridge, rather than on a crab angle. Captain Benjamin E. Joyce, expert witness for the plaintiff, opined that the only proper and safe manner for transiting the Berkley Bridge is to stabilize the tow before entering the span and then to pass under the bridge essentially parallel to the fender system. Captain Joyce is a man with many years of experience in the theories of maritime navigation and is to be credited for his wealth of knowledge. However, Captain Joyce has never transited the bridge in question, and, in fact, has never been in command of a flotilla made up in this manner while transiting any bridge.

Captain Joyce's opinion, in the view of this court, is heavily outweighed by the real-world testimony of Captains Arthur Knudsen and Bennie Dize, in addition to that of Captain Wactor. The former both stated

that the approach taken by Wactor was the approach normally taken to the Berkley Bridge and the one that in fact has been taken by each of them numerous times in the past with success. In addition to the testimony at trial, case law states that the captain of a vessel may select his reasonably chosen route as he sees fit. "Under maritime law, a vessel has a right to navigate the entire channel in the absence of known obstacles." *Folkstone*, 64 F.3d at 1052 (citing *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1470-71 (5th Cir. 1991)) (other citations omitted). Given both the case law and the testimony in the instant case, this court finds that Captain Wactor was under no duty to stabilize the tow in order to make a straight approach to the bridge, as opposed to following the normal practice in this area of transiting the Berkley Bridge on an arc, or "crabbing" — that is, moving at a crab angle. Thus, defendants carried their burden of rebutting any presumption of negligence as to the manner of steering by a preponderance of the evidence.

As to the third of plaintiff's claims, Captain Joyce testified that a prudent navigator would have utilized commercially-available weather reports to determine the wind speed and velocity on the date in question before attempting to transit the Berkley Bridge. Plaintiff cites cases from the First and Second Circuits requiring a captain to take into consideration weather conditions.[4] However, this court finds that obtaining such a weather report from the airport was not required under the circumstances for a flotilla transiting the Berkley Bridge. Although Captain Wactor admitted at trial that he did not use the readily-available airport forecast/conditions report, he did take into consideration what he believed, and the court finds, was more relevant, the weather at the bridge, including wind and current, as opposed to miles away at the airport.

Captain Knudsen, who was called as an expert witness for the defendants, testified that in his many years of commanding tugs, and now as manager of a tug company, the airport weather reports have not proved accurate, dependable, or useful to tug captains transiting the Berkley Bridge or piloting in its environs. Captain Dize, who had transited the bridge a number of times, testified that the airport weather reports are not

---

[4] "Among other things, the master has a clear duty to monitor and take into account weather conditions." *DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 748 (1st Cir. 1989) (finding a tug captain negligent for disregarding inclement weather forecasts and persisting in a voyage under hazardous weather conditions). *Chemical Transporter, Inc. v. M. Turecamo, Inc.*, 290 F.2d 496 (2d Cir. 1961), although cited for the same proposition by plaintiff, contains no reference to weather that this court is able to discern.

accurate for the bridge area, as did Captain Wactor, although both acknowledged that the airport reports might be one useful piece of information in gauging conditions at the bridge. Even Captain Joyce acknowledged that wind conditions in a sheltered area, such as the bridge area and its surroundings, would not be the same as the wind conditions at the airport, even if the areas were adjacent instead of several miles apart. The credible testimony was that the swirls and lulls in wind patterns created by tall buildings and the bridge structure itself create a different wind pattern, including direction and speed, than would be found in an open area like the airport.

This court finds by a preponderance of the evidence that it was sufficient for Captain Wactor to estimate the wind and current on his own, without knowing the wind report for the airport, and, further, that his estimate of the wind velocity was not mistaken and was not a causative factor in this allision. Any mis-estimation of the wind velocity by Captain Wactor was made, if at all, in his verbal categorization of the wind strength, not in his actual calculation of and reaction to the strength and direction of the wind at the scene. All witnesses except Captain Joyce agreed — and the court has previously stated its reasons for giving less weight to Captain Joyce, despite his obvious skills — that the approach to the bridge taken by Wactor was correct under all the circumstances, including the wind and current at the bridge at the time. Again, defendants have rebutted the presumption of negligence by a sufficient showing of proper calculation of wind and currents by Captain Wactor.

Last, as to plaintiff's fourth claim, all of the evidence was that Captain Wactor tried but was unable to communicate by radio with Captain Dize; that he did notify Engineer Regambal; and that Regambal, reacting with admirable speed, was able to correct the problem almost immediately. Nothing was offered to show how the defendants could have reacted any more quickly or more effectively to correct the problem than they did. The defendants' evidence as to their quick corrective actions rebuts any presumption of negligence as to their reactions to the crisis created by the loss of steering.

In conclusion, this court finds in favor of the defendants, finding their evidence successfully rebuts any presumption of negligence by demonstrating, by a preponderance of the evidence, a lack of fault on the part of Captains Wactor and Dize in creating or contributing to the steering problem and in their behavior in the face of a complete, albeit temporary, loss of steering. The court finds that their evidence has established that (1) their maintenance was appropriate and they could not have reasonably antici-

pated breakage of the weld that caused the loss of steering; (2) their approach to the Berkley Bridge was proper and took into account wind and currents; (3) their failure to use the airport weather report was reasonable and did not constitute negligence; and (4) they reacted reasonably and with alacrity to the sudden discovery of an unexpected loss of steering.